# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### WESTERN DIVISION

Civil Action No.:  <u>5:05-CV-102-BO</u>

| | | |
|---|---|---|
| DENNIS GREEN, | ) | |
| | ) | |
| Plaintiff, | ) | D E P O S I T I O N |
| | ) | |
| vs. | ) | O F |
| | ) | |
| CITY OF RALEIGH and JANE | ) | J A N E   P E R L O V |
| PERLOV, individually and in | ) | |
| her official capacity as | ) | |
| Chief of Police for the | ) | |
| City of Raleigh, | ) | |
| | ) | |
| Defendants. | ) | |

- - - - - - - - - - - - - - - - - - - - - - - - - - -

## A P P E A R A N C E S

For the Plaintiff:    Ms. Elizabeth A. Murray
Alliance Defense Fund
801 G. Street N.W.
Suite 509
Washington, D.C.   2001

Ms. Delia Van Loenen
Alliance Defense Fund
15333 North Pima Road
Suite 165
Scottsdale, Arizona   85260

For the Defendants:   Ms. Dorothy K. Leapley
Associate City Attorney
One Exchange Plaza
Suite 1020
219 Fayetteville Street Mall
Raleigh, North Carolina 27601

In Raleigh, N.C.        Reported by:
February 27, 2006       Kimberly A. Petrarca

 COPY



# Pace Reporting Service, Inc.

*General Court Reporting & Videotaping*
Post Office Box 252 • Cary, NC 27512
Telephone: (919) 859-0000 • Facsimile: (919) 859-1215
Fayetteville: (910) 433-2926 • Wilmington: (910) 790-5599

<u>E X A M I N A T I O N   I N D E X</u>

| <u>Examination</u> | <u>By Whom</u> | <u>Page No.</u> |
|---|---|---|
| Direct | Ms. Murray | 4 |

<u>E X H I B I T   I N D E X</u>

| <u>Exhibit No.</u> | <u>Description</u> | <u>Page Marked</u> |
|---|---|---|
| Plaintiff 7 | Responder List | 34 |
| Plaintiff 8 | Handwritten Note in re Promise Keepers | 46 |
| Plaintiff 9 | Photograph | 54 |

## S T I P U L A T I O N S

It is hereby stipulated and agreed between the parties to this action, through their respective counsel of record:

(1)    That the deposition of JANE PERLOV may be taken on February 27, 2006, beginning at 11:41 A.M. in the offices of the City Attorney, located at One Exchange Plaza, Suite 1020, 219 Fayetteville Street Mall, Raleigh, North Carolina, before Kimberly A. Petrarca, a Notary Public.

(2)    That the deposition shall be taken and used as permitted by the applicable Federal Rules of Civil Procedure.

(3)    That any objections of any party hereto as to notice of the taking of said deposition or as to the time or place thereof, or as to the competency of the person before whom the same shall be taken, are deemed to have been met.

(4)    Objections to questions and motions to strike answers need not be made during the taking of this deposition, but may be made for the first time during the progress of the trial of this case, or at any pretrial hearing held before any judge of competent jurisdiction for the purpose of ruling thereon, or at any other hearing of

Stipulations                                                    -3-

said case at which said deposition might be used, except

that an objection as to the form of a question must be made

at the time such question is asked, or objection is waived

as to the form of the question.

(5)   That the witness waives the right to read and

sign the deposition prior to filing.

(6)   That the sealed original transcript of this

deposition shall be mailed first-class postage or hand-

delivered to the party taking the deposition for

preservation and delivery to the Court, if and when

necessary.


*   *   *   *   *


Whereupon,

JANE PERLOV,

having been first duly sworn,

was examined and testified

as follows:

Case 5:05-cv-00102-BO    Document 36    Filed 08/14/06    Page 4 of 65

attorney instructs you not to answer.

If you remember any additional information or need more clarification to a previous answer, please stop me at any point in the deposition to supplement a previous answer.

Also, if you think of any documents that might help in adding information that would help you answer a question, please let me know.

What is your educational background?

A   I have a B.S. degree in criminal justice.

Q   Where did you obtain that degree from?

A   New York City, John Jay College, criminal justice.

Q   Where are you currently employed?

A   City of Raleigh Police Department.

Q   How long have you been employed there?

A   Since September of 2001.

Q   What is your job title with the City of Raleigh?

A   Chief of police.

Q   What are your responsibilities as chief of police?

A   I oversee the day-to-day operations of the Raleigh Police Department. I deal with personnel issues, budget issues, policy issues. I report to the city manager.

Q   Are there any other responsibilities that you can

Case 5:05-cv-00102-BO    Document 36-3    Filed 08/14/06    Page 5 of 65

think of that you did not include in your list?

A    Anything that has to do with the running of the police department, I'm responsible for.

Q    Does your responsibility also include enforcement of city ordinances?

A    Yes, it does.

Q    As part of that enforcement responsibility, do you also enforce sections 12-55 through -57 of the Code of Ordinances of the City of Raleigh?

A    Yes.

Q    Do you know when picketing ordinances, meaning section 12-55 and following, were enacted?

A    Prior to my arrival here.

Q    Do you have knowledge of when that exactly occurred?

A    Many years ago.  I don't know--I don't know when--when it was.

Q    Do you know which government officials were involved in drafting the picketing ordinances?

A    Well, we work in a--in a manager/council form of government.  So the ordinances would--would be written by an attorney, maybe a--maybe at the request of the council, maybe not.  And the council would enact an ordinance--they would vote to enact

Case 5:05-cv-00102-BO    Document 36    Filed 08/14/06    Page 6 of 65

it.

Q    Are you aware of the purpose behind the picketing ordinances?

A    The specific ordinances?

Q    Are you aware of the purpose behind the specific picketing ordinances?

A    When they were written or now?

Q    When they were enacted.

A    I can't answer when they were enacted, because I wasn't employed here at the time.

Q    Do you have any knowledge of the purpose of the picketing ordinances at the time of enactment?

A    No, not in Raleigh.  No.

Q    Okay.  Do you know what the current purpose is behind the picketing ordinances?

A    The purpose of the ordinance is to maintain everybody's rights, maintain the safety in the city, give us the ability to plan for an event.

We don't have an unlimited number of police officers.  So knowing when anything is going to take place in the city is really important to us, so we can keep up with our regular duties of answering the radio, responding to 911 calls, and patrolling the streets of the city.  So

that--that's a--that's an important part of the ordinance.

And the other parts would be to protect the protesters or the demonstrators, any counter-demonstrators, any passers-by, people driving in the street, walking in the street, businesses, citizens, basically to maintain the peace, maintain everybody's safety.

Q Approximately--do you know approximately how many picketing or--picketing permits or notice of intent--notice of receipts are given on any given week?

A I don't know.

Q Do you know if responding to situations concerning picketing is a--is a--is something that occurs on a routine basis?

A I don't know what a "routine basis" would be.

Q Okay. Do you know if officers are--respond to picketing situations on a weekly basis?

A Do you mean each officer or an officer?

Q Would you please--

A We have seven hundred and twenty-six (726) police officers. So--

Q Okay. Are you made aware of how many incidents

Case 5:05-cv-00102-BO    Document 36-3    Filed 08/14/06    Page 8 of 65

occur within the city on a weekly basis?

A    How many incidents of--of what?

Q    Okay.  Are you aware of how many--do you receive a report concerning expressive--do you receive a report concerning incidents that are responded to by police officers as a group?

A    I receive a report of the number of crimes that are committed in the city each day.

Q    Okay.  Does that report include situations from picketing?

A    If there was a crime involved.

Q    Approximately--as you've looked through these reports, have you ever seen something related to a picketing offense?

A    Not to my recollection.

Q    Are there any other reports where information concerning a picketing-related offense might appear?

A    Not--not that I know of.

            MS. MURRAY:  Would you mark this as Perlov Exhibit 1, please?

            MS. LEAPLEY:  Can we go off the record for a moment?

            MS. MURRAY:  Sure.

Case 5:05-cv-00102-BO     Document 36     Filed 08/14/06     Page 9 of 65

(DISCUSSION OFF RECORD)

MS. MURRAY:  Please--please let the record reflect that we will not be marking Perlov Exhibit 1.  We'll be referring back to previous Exhibit 2--

MS. LEAPLEY:  Bryant.

MS. MURRAY:  Previous to Bryant Exhibit 1.  Bryant Exhibit 1, which is Ordinance 10-1255.

Q  (By Ms. Murray)  Would you take a moment to review this document, to review section 12-1055?  Are you familiar with this document?

A  Yes.

Q  What does the term "demonstrator" mean to you?

A  "Demonstrator" means someone who was sharing an opinion on some issue publicly.

Q  Anything else?

A  That's basically what it means to me.

Q  What does the term "persons participating in a vigil" mean to you?

A  People that are again sharing some point of view or feeling, some feeling they have, some emotion they have, publicly.

Q  Is there a particular trait that marks something differently than from a demonstrator than a vigil?

Case 5:05-cv-00102-BO    Document 36    Filed 08/14/06    Page 10 of 65

A        It could.  I mean, certain things could, but--but things could also be similar in both of those. Something that might be particular to a vigil might be holding a candle, for instance.

Q        Looking further at the definition, it states, "And any action primarily promoting or objecting to a policy," is that correct?

A        That--

Q        Does that--is that a correct--

A        That's what it says.

Q        --read of the policy?

A        Uh-huh (yes).

Q        Can you--would you say "yes" out loud, please?

A        Yes.

Q        Thank you.  What does the term "action primarily promoting to a policy" mean to you?

A        Again, any action that's dealing with an issue.

Q        What does "and any action primarily objecting to a policy" mean to you?

A        Same thing:  objecting to an issue.

Q        What does the term "policy" mean for purposes of this ordinance?

A        To me it means an issue.

Q        Does the policy have to be officially enacted in

order for it to be a policy for purposes of this ordinance?

A   No.

Q   Looking further at the policy--the ordinance section 12-1055, it states, "Portion"--that "the ordinance applies to portions of the public ways not used primarily for vehicular parking and moving traffic," is that correct?

A   That's correct.

Q   What areas of the city do you consider "portions of the public ways"?

A   Public right-of-ways.

Q   Okay.  Anything else?

A   Portions of the sidewalks.

Q   Can you think of any--any other location?
I'll--can you--

A   Blocks.

Q   Okay.

A   City blocks.

Q   For purposes of this ordinance, how does an officer determine whether an individual's action primarily rather than secondarily or otherwise promotes or objects to a policy?

A   Through training and experience.

Case 5:05-cv-00102-BO    Document 36    Filed 08/14/06    Page 12 of 65

Q    Can you think of a particular example where an individual has been engaging in expression, but it was not primarily promoting or objecting to a policy?

A    A conversation.

Q    Okay.  In your mind, does the term "primarily" in this definition--does a question of whether somebody's action constitute picketing ever turn on whether they were primarily versus secondarily or otherwise promoting or objecting to a policy?

A    Can you say that again?

Q    Sure.  Looking at this definition, it uses the term "primarily."  How do you tell whether an individual is primarily doing something rather than--

A    You're talking--we're talking about the first, primarily?

Q    Don't--yes--

A    Primarily promoting or objecting, correct?

Q    Yes.  So again, how do you tell if somebody's conduct constitutes primarily promoting or objecting to a policy?

A    Again, through training and experience.  It's similar to the way we establish probable cause.  We look at the totality of the circumstances.  So

there's many different things that enter into that decision as to whether they are primarily promoting or objecting to a policy.

Q    Okay.  How would somebody's education and training help them decide whether or not something primarily promoted or objected to a policy?

A    The same way training and experience lets you decide anything.

Q    Okay.  As somebody with education and training in the law enforcement field, how would you handle a situation where you are determining whether someone's action primarily was promoting or objecting to a policy?

A    I would rely on my experience, I would rely on what I--I learned, and I would confer with the police attorney at certain times.

Q    Okay.  Which factors would you look to and evaluate when considering someone who is engaging in picketing activities to tell whether or not they were primarily promoting or objecting to a policy?

A    I would look at their actions.  I would look at any paraphernalia they had.  I would view the place that they were--that they were demonstrating or picketing at, the reaction of people going by,

Case 5:05-cv-00102-BO     Document 36     Filed 08/14/06     Page 14 of 65

whether or not they were walking or speaking in a certain fashion. Those are some of the things I would consider.

Q Have you received any training yourself concerning what constitute action primarily promoting or objecting to a policy?

A Yes.

Q And what training was that?

A Police training throughout the years.

Q Did that training occur at the City of Raleigh?

A I had legal training in the City of Raleigh, yes.

Q Did that training relate solely to the picketing ordinances or the City of Raleigh ordinances in general?

A It related to the City of Raleigh ordinances, all of the ordinances. I had to actually go through police academy training when I got here.

Q Okay. Did you learn about training what the City considers action primarily promoting or objecting to a policy?

A I don't remember specifically what I learned there.

Q Would you please look at Bryant Exhibit 2, please? Could you take a moment and review that document, please?

A       (Examines paperwritings.)  Okay.

Q       What is that document?

A       It's "Picketing Permitted: Notice of Intent and
Receipt Required," section 12-1056.

Q       Are you familiar with that document?

A       I am.

Q       Looking at the first sentence of this policy, would
you read the first sentence into the record?

A       "Peaceful picketing shall be permitted in the city
provided the same is done under the following
conditions:"

Q       All right.  What is speech--what speech is not
considered "peaceful picketing"?

A       Things that you--that cause people to break the
law, cause riotous behavior, those types of things.

Q       Is there any other speech that you can think of
that would not be considered peaceful picketing?

A       Not the speech itself.  Just what--what--what the
speech would cause would make it not peaceful, such
as riotous or illegal behavior.

Q       Under section 12-1056, must an individual receive a
notice of receipt in order to speak with
indi--in--in order to engage in oral speech in the
public way?

A    If it's picketing.  If it's picketing, they must receive a receipt from a notice, yes.  If it's picketing.

Q    Is oral--is oral speech picketing?

A    Not a conversation.

Q    Okay.

A    Certain types of speech.

Q    What type--what kind of speech, in your opinion, constitutes picketing?

A    Well, we just went through Exhibit 1 where it defines "picketing."  If I can read it to you again--

Q    That's okay.  Are you referring to the definition of "picketing"?

A    That's correct.

Q    Under section 12-1056, what must an individual do in order to hold up a sign in a public way?

A    "They shall give notice of intent and get a receipt from the City."

Q    Do you know what the purpose is specifically behind the notice-of-receipt requirements for the City?

A    I wasn't here when this law was enacted.

Q    Do you know what the current purpose is of getting a notice of receipt from the City for--to engage in

Pace Reporting Service, Inc.
Wilmington (910) 790-5599 ◆ Raleigh (919) 859-0000 ◆ Fayetteville (910) 433-2926

picketing activities?

A    Well, first, it's the law.  And--and, secondly, for us it gives us an ability to plan for the peaceful protest for all involved.

Q    Are there any other purposes that you're aware of?

A    From my point of view, it's the planning and it's--it's required.  It gives us an opportunity to have a conversation with somebody who's getting a--a permit and usually works out well.  We--we get to discuss what their needs are.

Q    From your perspective, why does the City want to know in advance whether expressive activity--whether picketing--let me rephrase that--whether--why does the City have to know in advance whether picketing occurs in the public ways?

A    From my point of view, public safety's paramount in any picket or demonstration.  There are always people who are--are against or--or for, and usually it's pretty much fraught with emotion.  And our objective is to be able to keep the peace, have the proper staffing and be able to also run the rest of the city as we need--as we see fit.  We don't have a lot of extra police officers on shift at any

time.

Q    Now, you mentioned earlier that you really haven't--that you haven't seen any citations related to picketing activities.

Do you know why there is a requirement to get a picketing permit when there have not been any citations issued under this ordinance that you can recall?

A    I am aware that almost everybody, if they do not have the proper receipt, gets the proper receipt on commencing their picketing. If we roll up on them and ask them for it, if they don't have it, they'll get it. And we make it very easy for that to happen. That's probably why there are no citations.

Q    Who is your designated representative for purposes of 12-1056?

A    It would normally be a supervisor at the front desk of the station, but it could also be a supervisor on the scene. It would be a supervisor in the police department.

Q    Have you ever been consulted by anyone working at the police department concerning a--concerning a request for a notice of intent?

A    Consulted in what way, for what reason?

Q    Have you been--have you been consulted concerning--concerning whether or not an individual's speech constituted peaceful picketing or not in order to--before they were to go ahead and--before the officer were to go ahead and sign--

A    No.

Q    --the receipt?

A    I have not, no.

Q    Have you ever room signed a note--a notice of receipt?

A    No.

Q    Who signs the majority of the--have you seen a signed a notice of receipt?

A    I have.

Q    Okay.

A    I have now and again.  I don't see them on a regular basis.

Q    Is there anyone else besides the sergeant, perhaps working at the desk, who signs a notice of receipt?

A    Other supervisors would be able to.

Q    Approximately how many receipts has the City issued under picketing ordinances?

A    I think as I stated before I don't know the number.

Q    Do you know if receipts are issued on a weekly basis?

A    What do you mean by that?

Q    Do you know if--

A    Like given out once a week?

Q    Yes.

A    Oh, I think that they're given out when the person is--is there.

Q    Do you know approximately how frequent--frequently the notice of receipts are--are issued?

A    I don't.

Q    To the best of your recollection, are you aware of any receipts that were declined to be issued?

A    I am not aware of any.

Q    Are you aware that any city officials declined to issue a receipt because the speaker sought to engage in speech that would likely to incite or produce imminent lawless action?

A    I am not aware of any.

Q    How would you handle a request to engage in speech that would like incite or produce imminent lawless action?

A    I think it's very hard to determine that.  I--I think what we do is give a receipt, and we

police--we police it then as we see fit.  If we feel there's going to be issues on speech or behavior that really raises the emotions of others or the people involved in the demonstration, then we police it accordingly.

But we--our goal is to safely allow anybody to express whatever issues, opinions or ideas that they want in our city.

Q    And after--after the City issues a--a receipt of notice, how are police--how does police staffing occur in response to the picketing notices?

A    It depends how much time we have in advance.  If we have time in advance, we plan--we plan--again, we usually have conversations with the people requesting the permit.  It's a--it's a very friendly--it's a very friendly occurrence.

We--no matter--matter what--what their issue is or how--or how controversial it is, our--our goal is to make sure everybody's safe, that the people protesting are safe, that the counter-protestors are safe, and that the people generally in the city are safe, and that my police officers are safe.  So we'll have as much conversation as we can to figure out what we need

Case 5:05-cv-00102-BO    Document 36    Filed 08/14/06    Page 22 of 65
Wilmington (910) 790-5599 ◆ Raleigh (919) 859-0000 ◆ Fayetteville (910) 433-2926

to staff a demonstration with.

Q    Have you or any other City official declined to issue a receipt, because the speaker sought to engage in speech that was considered violent?

A    Not as far as I know.

Q    How would you handle a request to engage in speech that was considered violent?

A    I think we just answered that saying that I--until--you know, normally or--matter of fact, all the time we give out a permit--not a permit, we give them a receipt, and we'll just police that demonstration accordingly.

Q    Have you or any other city official declined to issue a receipt, because the speaker sought to engage in speech that was considered controversial?

A    No.

Q    How would you handle a request to engage in speech that was considered controversial?

A    I'd give the receipt and then handle the demonstration accordingly.

Q    Would you look at Bryant Exhibit 6, please?  Would you please take a moment and review that exhibit?

A    (Examines paperwritings.)  Okay.

Q    What is this document?

Case 5:05-cv-00102-BO     Document 36     Filed 08/14/06     Page 23 of 65

A    It's "Standards of Conduct for Picketing Activities."

Q    Are you familiar with this document?

A    Yes, I am.

Q    Looking at provision (b), why does the City limit placard and signs to twenty-four inches?

A    Again, I wasn't here when this provision was put into law.

Q    Do you have any knowledge concerning the current purpose of the City in having an ordinance that limits signs to twenty-four inches?

A    I--I would say the signs are generally limited in size and demonstration, so for a number of reasons. We don't want to block the view or the--we don't want to block anybody's view into anything for safety reasons; we don't want to block the sidewalk; again, if we keep it to a certain size, it's--it's less likely that it will be blocking anybody's right to see anything, to hear anything or to move freely.

Q    Have you encountered any incidents as a result of an individual having a sign that was greater than twenty-four inches?

A    I probably have since I've been here, yes.

Case 5:05-cv-00102-BO    Document 36    Filed 08/14/06    Page 24 of 65

Q    Are you aware of any incidents that resulted in a citation as a result of a sign that was greater than twenty-four inches?

A    Again, people are generally cooperative, and if you ask them to put it away, they generally will.

Q    Are you aware of any situation where an individual had a sign that was greater than twenty-four inches that created any traffic-related incidents?

A    I'm--no.  Traffic-related incidents?  Not exactly traffic-related.  Somewhat traffic-related where people have big banners and cause traffic to slow down or use the sign as a shield to push, to move further into an area where they're restricted to be.

Q    Do you--in that example, do you know approximately how large the sign was?

A    There's--there's a number of times where people have signs that you would probably consider a banner that a number--it takes a number of people to hold.  But the sign is used for reasons as--again, as to push against barriers or police officers, to push their way into areas that are restricted, use it as a shield.  Any number of things.  And it's usually something you would

Case 5:05-cv-00102-BO    Document 36    Filed 08/14/06    Page 25 of 65

consider a banner.

Q    Are you aware of any citations that were issued
resulting in violations of the sign limitation and
provision 12-1057?

A    I am not aware of any.

Q    Do you know why the City selected twenty-four
inches as the limitation for signs?

A    I do not know.

Q    Do you know why it is the current policy for the
City to limit signs to twenty-four inches?

A    The policy has not changed since it was written.

Q    Do you know why the sign limitation is twenty-four
inches versus twenty-six inches?

A    I do not know why.

Q    Approximately at--at what feet--okay.  You
mentioned banners that had become problematic.
That--you had mentioned banners that were used
inappropriately in the city.

      At what point would you believe a sign
would create difficulty or to be used improperly as
a--you mentioned a blockade or something?

A    I can't speculate.  Depends on the circumstance.

Q    Okay.  If you were to guess, approximately how many
feet would the sign have to be in order for it to

create a traffic disturbance?

A    I cannot--I cannot guess.  It would depend on the circumstance or the location, and a number of other things.

Q    Okay.  Would you look at provision (c), please?

A    (Examines paperwritings.)

Q    Why does the City require that pickets, not marching, shall remain at least fifteen feet apart?

A    I don't know.

Q    All right.  Do you know what the current policy--why the policy is, as it is now, for why this requires people to stand fifteen feet apart?

A    I don't know.

Q    Are you aware if the--does the City enforce a fifteen-feet requirement under this ordinance?

A    Not as far as I know.

Q    Does the City enforce the size limitation of twenty-four inches?

A    Again, we try to work with the--with the demonstrators on either--we don't carry rulers with us.  So it's pretty much common sense.  And if the sign's too big, if it seems like it's more than twenty-four inches, then we'll ask them to put it down and get another sign.

Q    Have--have--are you aware of--are you aware--I believe you said that you--you're not aware of any citations that were issued under this ordinance; is that correct?

A    That's correct.

Q    Okay.  If no ordinance--if no citations were issued, how do your officers handle situations involving picketers?

A    Usually by conversation.  Our officers are trained to be professional and--and try to work with people.  Our--our intent when we police the demonstration or picket is not to arrest or to limit people's rights to expression or free speech.

     Our intent is to keep the--the public safe, and--and so we try to do that by reasoning, by talking.  That's--that's the first thing that we do, and we're pretty good at it.

Q    Would a--would a--an officer of the law at the police department require picketers to leave an area based on--based solely on the size of their sign?

A    No.  Again, as I said, we would discuss with them and ask them to put the sign away.  You know, we have discretion in whatever we do.  Officers have

discretion.

Q   Would that discretion perhaps be to permit a sign that was twenty-five inches?

A   As I said, we don't carry a ruler around, so it's common sense.  If it seems like it's within that twenty-four-inch inches, then--then that's okay. If it doesn't, then we're going to ask them to put it down.

Q   Do you know what the range is of when the City would ask them to put it down?  Would it twenty-four inches to thirty inches?

A   I--I can't answer that.

Q   Okay.  How are officers trained to--okay.  Strike that, please.

            Has the City ever required picketers to leave an area, because the picketers were solely standing closer than fifteen feet?

A   I can't answer that.  They've never done that.  I don't know.

Q   Are you saying you're not aware of any situations where an individual was required to leave, because they were standing closer than fifteen feet?

A   I am not aware of any situation.  That's correct.

Q   Could a--could a police officer require an

Case 5:05-cv-00102-BO     Document 36     Filed 08/14/06     Page 29 of 65

individual to leave an area if they were standing closer than fifteen feet?

A    According to the provision and the law, yeah.

Q    Is the--does that--is the fifteen-feet requirement enforced?

A    As I stated already, to my knowledge we do not enforce that.

Q    Looking at provision (e), do you know why the City restricts individuals to the outermost half of the sidewalk or other public way nearest the streets?

A    I was not here when the provision was written.

Q    Do you know why it is a current policy of the City to restrict picketers to the outermost portion of the sidewalk or other public way?

A    I can think of a possible reason for it:  It would tend to not block the entrance to private buildings or private property if they went towards the curb rather than towards the building line.  But again, I don't know why it was originally put in.

Q    Are you aware if there is a--is a current difficulty that the City encounters with picketers standing near private property?

A    I'm not sure I can answer that question.  It depends on each individual circumstance.

Q   Are you aware of why the current policy is to restrict picketers to the outermost portion rather than the innermost portion of the sidewalk?

A   Well, the current policy, again, is the original policy that was written all those years ago, and I just gave my reasons why I think that that might have been put in.

Q   And I'm asking you what is your understanding concerning the current policy of why they chose the outermost portion rather than the innermost portion concerning the area for picketers?

A   And I'll give you the same answer again.

Q   Please.

A   It's that I--the outermost portion--if you're--if you're near the curb, you tend not to block the entrance to a building or people's egress into or out of the building.

Q   Okay.  Have you ever instructed officers concerning how to enforce the picketing ordinances?

A   No.

Q   Have you ever evaluated an officer's--strike that, please.

    What is the standard operating procedure for officers that encounter individuals who are

Case 5:05-cv-00102-BO    Document 36    Filed 08/14/06    Page 31 of 65

engaging in picketing activities?

A    They would check if they had a receipt of notice, and they would usually instruct the person as to what they need to do, whether they need to get a receipt, they need to move somewhere else, they need to put down a sign, or--or they can continue on.

That would depend on the circumstance. It depends on how we got there. Depends on if we were called or we just drove by it.

Q    Is there any other reason that you can perceive for requiring individuals to cease their picketing activities other than failure to have a--a notice of receipt?

A    Again, if they are breaking the law, you know, they're breaking a state statute or a city law, you know, in addition or--you know, or causing a violent reaction, you know, violent behavior, if they're breaking the law. That would be another reason.

Q    Is there another reason for requiring picketers to disperse based on the--based on this current--based on section 12-1057 other than failure to obtain a notice of receipt?

MS. LEAPLEY: Objection. That's a legal question, and the ordinance speaks for itself. You may answer if you can.

A   I would--I would defer to my legal advisor, the police attorney.

MS. VAN LONEN: I think she's just asking if you--

A   No, I will--I would--

Q   Does that mean you don't know?

A   I would usually confer with my police attorney--

MS. VAN LONEN: Oh--

A   --on these issues--

MS. VAN LONEN: Okay.

A   --if it was a matter of interpreting the law. I don't interpret the law; I just enforce it.

Q   (By Ms. Murray) Looking at provision (h) in this statute, what is the punishment for failure to comply with the provisions of picketing ordinances?

A   They're unlawful and punishable as provided by law. So someone can be cited or arrested.

Q   Do you know what type of citation is issued for violation of this ordinance?

A   What type of citation?

Q        Yes.  It--

                MS. LEAPLEY:  The "citation" is a term of art--

                MS. MURRAY:  Okay.

                MS. LEAPLEY:  --used in North Carolina.

Q        Okay.  Does that--let me rephrase that, then.

                If an individual violates the statute and is arrested, what would they be arrested for?

A        It's a misdemeanor.

                MS. MURRAY:  Would you please mark this as Perlov Exhibit 1, please?

                MS. LEAPLEY:  That appears to be Exhibit 7.

                MS. MURRAY:  Okay.  Perlov Exhibit--

             (PLAINTIFF DEPOSITION EXHIBIT NO. 7

                MARKED FOR IDENTIFICATION)

                MS. LEAPLEY:  We want to continue numbering.

                MS. MURRAY:  Okay.

Q        (By Ms. Murray)  Will you take a moment to review this document, please?

A        (Examines paperwritings.)  Uh-huh (yes).

Q        Have you ever seen this document before?

A        I have not.

Q    Do you know what this document is?

A    I do not.

Q    Do you know if this is a document produced by the City of Raleigh?

A    I've never seen it before.

Q    Do you know if--have you seen any other similar documents of the City of Raleigh?

A    Not like this, no.

Q    Are you aware if this--(indicating)--is a record of the RBC Center property?

A    I don't know what it is.

Q    Will you look, please, to the third rectangular box towards the bottom of this document?

A    Uh-huh (yes).  Uh-huh (yes).

Q    It--this document lists three different responders. And as Responder 1, it lists Michael Bekolay; is that correct?

A    That's correct.

Q    Do you know who Michael Bekolay is?

A    I do not.

Q    This document also states that Responder--lists Responder 2 as Julie Peck; is that correct?

A    That's correct.

Q    Do you know who that is?

A        I do not.

Q        This document also states that Responder 3 is Raleigh PD No. 1; is that correct?

A        That's correct.

Q        Do you know if "Raleigh PD No. 1" refers to a particular individual with the Raleigh Police Department?

A        I don't know who it is.

Q        Does the Raleigh PD use a numbering system for officers?

A        (No response.)

Q        I'll ask it more clearly.

         Does the Raleigh Police Department use a numbering system for the identity of officers?

A        They have--officers have codes.

Q        How many digits are usually within one code?

A        The code number is according to when you came on the job, when you joined the department.  So there are four digits.

Q        Okay.  And could you as an example state your code?

A        Mine would be 2000.

Q        Okay.  Is there a subsequent number based on when you arrived--

A        That's my code number.

Q       Okay.

A       That's my--that's my call number.

Q       That's your call number.  Your call number is 2000;
is that correct?

A       Uh-huh (yes).  Uh-huh (yes).

Q       Okay.  Were there other individuals who came onto
the police department in the year 2000 besides
yourself?

A       Yeah, that was--yes.

Q       Okay.  And how are--how's their call number
distinguished from yours?

A       Well, each person as they come on gets the next
number.  But that's my code number as the chief.
That's not my call number.

Q       Okay.

A       My call--my code number is 2653.

Q       Okay.

A       But that's different from this.  That would be my
call sign.

Q       Okay.  All right.  Are--for purposes of this
description on this document as Raleigh Police
Department No. 1, does that have any significance
to you concerning the identity of--of who Responder
3 is?

Pace Reporting Service, Inc.
Wilmington (910) 790-5599 ◆ Raleigh (919) 859-0000 ◆ Fayetteville (910) 433-2926

A       It doesn't.

Q       Is your--does your office respond to incidents due to requests from the RBC Center?

A       My office?  Want to explain it?

Q       Does the Raleigh Police Department respond to--to incident reports from the RBC Center?

A       Respond to a call or--an incident report is a report that we take concerning an incident there. So we wouldn't respond to an incident report.  So could you--

Q       Yes.

A       --ask that another way?

Q       Sure.  Does the RBC Center ever contact the Raleigh Police Department concerning events at the RBC Center?

A       Yes.

Q       How does the RBC--how are--how is the Raleigh Police Department contacted by the RBC Center?

A       There could be a number of ways.  We have off-duty police officers that work there for their large events, or they can call 911 like any citizen could, or they can call one of the non-emergency numbers.

Q       And are you aware of how frequently there are

Case 5:05-cv-00102-BO    Document 36    Filed 08/14/06    Page 38 of 65

Raleigh off-duty officers that are at the RBC Center?

A    We're there for most of their events in--in varying numbers.

Q    Is there a contract arrangement between the Raleigh Police Department and the RBC Center to--to be at their events?

A    The--the--yes, yes, yes.

Q    Who was the contract--who entered into the contract?

A    Again, I--I don't know that I can answer that question.

Q    Have you seen a copy of the contract?

A    That specific contract?  No.

Q    Do you know how long there has--do you know for what period of time there has been a contract between RBC Center and the Raleigh Police Department to work at their events?

A    I don't know.  And again, I don't know if there's a contract between Raleigh Police Department and the City.  I know there's a contract between RBC and individual police officers.  I can't answer what--what the City has as a contract with them, and I don't know how long that's been.

Q    If an officer were to be working at the RBC Center, how would that occur?

A    They would fill out a off-duty employment request, give it to their supervisor.  It would be approved or disapproved and filed.

Q    Would an officer do that at--would an officer do that on--for each event that they wanted to cover, or would they do that for a period of time?

A    No, it would be for a period of time.

Q    Do you know how--how many--do you know at present how many officers are currently working as off-duty officers at the RBC Center?

A    I do not know a number.

Q    To your best--to your--if you were to approximate, how many officers approximately are working as off-duty officers at the RBC Center?

A    I--I wouldn't guess the number.

Q    Is that because you don't--you--you do not know?

A    No, the number there is depending on the event.

Q    Do you know if the--you--okay.  Just to be clear, going through the process of--what--what again was the document that you called it, an--what, an off-duty--

A    It's a request to work off duty--

Q       A request to work off duty.

A       --the officer files.

Q       Okay.  And you had mentioned that that is submitted to their supervisor; is that correct?

A       Uh-huh (yes).  That's correct.

Q       Okay.  And is there--is there anything next in the process of what is the officer--what does the supervisor do in response to a request?

A       They all approve or disapprove the request.

Q       Okay.  For--for what reason would an officer--would the supervisor approve the request?

A       For what reason would they approve it?

Q       Yes.

A       If there's no reason to disapprove it.

Q       And for what reasons would a supervisor disapprove a request--an off-duty request to work off duty at the RBC Center?

A       I don't--I don't know all the reasons.  Some of the reasons might be the officer might be on restricted duty, medical reasons, administrative reasons.

Q       If a--if an officer is approved for off-duty work at the RBC Center, how are they paid?

A       They are paid through the RBC Center.

Q       As an off-duty police officer working at the RBC

Q    Center, do the individual officers continue to wear their uniform while working at the RBC Center?

A    Yes.

Q    Does the officer working off duty at the RBC Center continue to wear enforcement measures like a gun?

A    They wear their uniform, yes.

Q    Okay.  Do officers engaged in work at the RBC Center who are off duty also use the--their City of Raleigh police cars?

A    Some of them do.

Q    How is a determination--when would they use their police cars?

A    Well, the RBC Center pays for cars on--by--you know, on an individual basis.  So they decide how many cars they'll need, and they pay for each car that they utilize.  An officer doesn't come automatically with a car.

Q    Have you ever seen an RBC car that an off-duty Raleigh Police Department officer drives?

A    An RBC car?

Q    Let me--yeah.  Let me rephrase that.

Have you seen an RCB car that is used by an officer?

A    I don't know what an RBC car is.

Case 5:05-cv-00102-BO    Document 36    Filed 08/14/06    Page 42 of 65

Q    Okay.  I thought you said that transport--is transportation sometimes provided by the RBC Center to the officer?

A    The officers--I'm not quite sure what you're asking me.

Q    Okay.

A    The officers don't automatically--when--when--when the RBC Center hires an off-duty police officer, they do not come necessarily with a RPD vehicle. That's--that's done separately.

Q    Okay.

A    So they might have ten officers and only two vehicles.

Q    Do the--if there were--of those ten officers, the two--and the two have vehicles--

A    Uh-huh (yes).

Q    --is that--do they have vehicles because they were issued to them by the Raleigh Police Department, so they are theirs to use while at the RBC Center?

A    No.

Q    No.  Okay.  How is a determination made concerning whether or not an officer has a car available to use at the RBC Center?

A    Again, it's a contractual agreement with the RBC

how many cars they need for a particular event, and the number varies. I don't make that decision.

Q So is it a separate--is it a separate arrangement concerning how many officers are at the RBC Center working off duty and how many cars are available of the Raleigh Police Department's?

A Yes.

Q Okay. You mentioned earlier that there--I believe you said that there is a contract between the City of Raleigh and RBC Center.

A I said I don't know what that would be, because--I--I guess the attorneys would know that. I don't know what that arrangement is. I know the arrangement made between my officers and the RBC Center. As far as a contract, I can't answer that.

Q Do you know about a contract between RBC Center and the City of Raleigh?

A They probably have a lot of contracts, but I don't know what they would be.

Q Looking back at--okay. Just to finish up what we were talking about--

A Uh-huh (yes).

Q --after an officer is approved for off-duty--

A Uh-huh (yes).

Q      --work at the RBC Center, is there anything else
that is done from the perspective of the City of
Raleigh concerning the work that is done there at
the RBC Center on behalf of the officers?

A      I'm not quite sure what you're asking me.

Q      Okay.  All right.  I'll--I'll clarify that.

After an RB--after the--the officer is
approved for off-duty work at the RBC Center, is
there any other involvement by the City of Raleigh
concerning--concerning anything?

A      Well, concerning anything?  It--it depends.  I
mean, we could be called there on duty for an
accident or something that happens there; any
number of things.  There could be any different
types or reasons for involvement after that.

Q      Does the officer have to file any sort of report
concerning their off-duty work at the RBC Center?

A      No.

Q      Is there any sort of paper--any sort of paperwork
done at all or any follow-up by the supervisor
concerning the activities of the RBC Center?

A      It would be the same as in any police incident, you
know, an incident report.  It would be--there's no
difference whether it's on duty or off duty.

Q    All right.

MS. MURRAY:  Would you mark this as Perlov Exhibit 8, please?

(PLAINTIFF DEPOSITION EXHIBIT NO. 8 MARKED FOR IDENTIFICATION)

Q    Would you take a moment and review this document, please?

A    (Examines paperwritings.)  As much as I can read it, yeah.

Q    Okay.  If you would, look to the second bullet point, the one with an arrow--

A    Uh-huh (yes).

Q    --and could you read that bullet into the record, please?

A    I can try.  "Anti-abortion protesters were on the property without a permit.  They were also handing out literature."

Q    Do you recognize this document?

A    I do not.

Q    Is this written in your handwriting?

A    No.

Q    Have you ever seen this document?

A    No.

Q    Do you recognize the handwriting?

Case 5:05-cv-00102-BO    Document 36    Filed 08/14/06    Page 46 of 65

A       No.

Q       Are you aware if this is an RBC Center document?

A       I don't know what it is.

Q       Are you aware if the picketing ordinances apply to the property of the RBC Center?

A       Again, that's a legal question, but I would say not.  It's private property.

Q       I'm not sure--I wasn't asking you for your legal opinion of this.  I was just asking you, are you aware if the City--if the ordinance applies and is enforceable at--at the RBC Center?

A       I am saying it's private property.  So--

                MS. LEAPLEY:  The question has been asked and answered.

                MS. MURRAY:  Okay.

Q       Would an individual be cited under the picketing ordinance for failure to have a notice of receipt at the RBC Center property?

                MS. LEAPLEY:  Just so I am clear.  Not on the public right-of-way that abuts the RC Center--RBC Center, but on the private RBC Center property?

                MS. MURRAY:  Yes, that's what I'm asking.

A       As I answered already, the City ordinance does not

apply to private property.

Q    Okay.  Do you recall the events on August 23rd, 2003, that are the subject of this lawsuit?

A    No.

Q    When did you become aware of the August 23rd, 2003 events?

A    I don't know when I became aware of them.  I know I was aware once the lawsuit started, because the lawsuit was initiated.  So that's my memory of it.

Q    Are you saying you first became aware of the events after--of the events on August 23rd, 2003, upon reading the complaint?

A    I'm saying I can't pinpoint the time.

Q    Okay.  Do you recall reading the complaint?

A    At some point.

Q    Are you aware when the complaint was filed?

A    I'm not.

Q    Okay.  Do you specifically--do you have any knowledge of the August 23rd, 2003 events prior to your review of the complaint?

A    As I said, I'm not sure of the time I became aware of it, but I do not have independent knowledge of those--of those events.

Q    How were you made aware of the August 23rd, 2003

Pace Reporting Service, Inc.
Wilmington (910) 790-5599 ◆ Raleigh (919) 859-0000 ◆ Fayetteville (910) 433-2926

events?

A    I don't remember.

Q    What is your understanding of the August--please describe the August 23rd, 2003 events as you understand them.

A    What this emanates from?

Q    Yes.

MS. LEAPLEY:  In--are you asking what she's been advised by counsel?  Are you asking what the pleadings say?

MS. MURRAY:  I'm asking her what her understanding is of the events, of what occurred there.

MS. LEAPLEY:  To the extent that you can answer that question without referring to what I have told you or what we have discussed--

A    I have no independent knowledge of the events other than from the court papers or conversation regarding the lawsuit.

Q    (By Ms. Murray)  Have you discussed the August 23rd, 2003 events with any--with any officer who--who was involved in the event on August 23rd, 2003?

A    I don't remember if I have or not.  I don't

remember specifically discussing them, no.

Q    Okay.  Do you know Sergeant Gary Hinnant?

A    Yes.

Q    Does--is he--is Sergeant Gary Hinnant employed by the Raleigh Police Department?

A    Yes.

Q    Is he employed there as a sergeant?

A    Yes.

Q    Do you know how long Gary Hinnant has been with the Raleigh Police Department?

A    I do not.

Q    Do you know if Gary Hinnant was employed by the Raleigh Police Department as of August 23rd, 2003?

A    Yes.

Q    And to make that question more specific, do you know if he was employed actually on August 23rd, 2003?

A    I would say yes.

Q    Have you spoken with Gary Hinnant concerning the events on August 23rd, 2003?

A    I don't know if I have or not.

Q    Have you reviewed any reports concerning any--concerning the events on August 23rd, 2003?

A    Not that I can recall.

Case 5:05-cv-00102-BO    Document 36    Filed 08/14/06    Page 50 of 65

Q    And by "reports," I mean police reports.

A    No.

Q    Are you aware if any police reports were made for that particular date?

A    For that particular event on that particular date, are you asking me?

Q    Let me rephrase that.  Yes, I'm asking you for that particular event on that particular date.

A    I'm not aware of any.

Q    Are you aware if Gary Hinnant was at the RBC Center on August 23rd, 2003?

A    Again, are we talking about my independent knowledge or my knowledge sometime after these proceedings were initiated?

Q    I am asking for your knowledge outside of what your counsel has informed you before and after August 23rd, 2003.

A    Again, are you--are you including pleadings or--or other things that might have come out of this incident after the incident?

Q    Yes.

A    Then--then I am aware that--that he was involved.

Q    Okay.  What--what--to the extent of your knowledge, how was Gary Hinnant involved on August 23rd, 2003,

at the RBC Center?

A   I don't know how he was involved other than he was there.

Q   Do you know anything about what activities occurred there at the RBC Center on August 23rd, 2003, concerning the incident in question?

A   Again, not--not from that date but from the proceedings afterwards, yes.

Q   Do you know if Gary Hinnant was working at the RBC Center as an off-duty police officer?

A   I believe that he was.

Q   And what do you base your knowledge on that Gary Hinnant was working as an off-duty police officer at the RBC Center on August 23rd, 2003?

A   That there is a videotape from that day.

Q   Have you reviewed that video--have you reviewed the videotape of August 23rd, 2003?

A   From that particular incident?

Q   Yes.

A   Yes.

Q   Did you recognize the officer in that video?

A   Yes.

Q   Who was the officer?

A   It was Sergeant Hinnant.

Q    Sergeant Hinnant.  I guess I was pronouncing his name wrong.

Are you aware of the--Gary Hinnant's involvement other than what you saw in the police--in--in the video of August 23rd, 2003?

A    No.

Q    How did the video inform you that Gary Hinnant was working as an off-duty police officer on that day?

A    Well, I can't say that I know he was working off duty, because he could have been on duty.  So I can't really say.  I know he was at the RBC Center on that day.  I don't know what his capacity was.

Q    How would you determine Gary Hinnant's capacity for his involvement at the RBC Center on August 23rd, 2003?

A    I guess you'd have to ask Gary Hinnant.

Q    Did you approve an off-duty request by Gary Hinnant for August 23rd, 2003, at the RBC Center?

A    Personally, no.

Q    Have you seen an off-duty request that was approved for Gary Hinnant for that day?

A    I don't see off-duty requests, generally.

Q    Were you made aware that Gary Hinnant was working as an off-duty police officer on that day by

Case 5:05-cv-00102-BO    Document 36    Filed 08/14/06    Page 53 of 65

somebody who--by another individual who may have approved his request?

A    Not that I recall.

Q    Where are off-duty requests stored after approval?

A    They're stored in the main--in the--at main headquarters.  I'm not--I don't know exactly who keeps them.  It could be personnel might have them.

Q    Is there anywhere else that they're stored besides perhaps personnel?

A    I--I don't know where they're store.

Q    Do you know which officer, if any, encountered Dennis Green other than Gary Hinnant on August 23rd, 2003?

A    I have no independent knowledge on the events of that day.

                MS. MURRAY:  Would you mark this as Perlov Exhibit 9, please?

        (PLAINTIFF'S DEPOSITION EXHIBIT NO. 9

            MARKED FOR IDENTIFICATION)

                MS. LEAPLEY:  Do you have a copy of the photo for me?

                MS. MURRAY:  I do.

Q    (By Ms. Murray)  This is a color copy of a picture that was previously produced in black-and-white

Case 5:05-cv-00102-BO     Document 36     Filed 08/14/06     Page 54 of 65

copy form to your office--to Dottie's office.

MS. LEAPLEY:  Is--is Mr. Green bringing his son tomorrow?

MS. MURRAY:  Are we off--can we go off the record, please?

MS. LEAPLEY:  That's fine.

(DISCUSSION OFF RECORD)

Q  (By Ms. Murray)  Would you take a moment and review the picture that was marked as Exhibit 9, please?

A  (Examines paperwritings.)  Okay.

Q  Do you recognize any of the individuals in the picture?

A  Well, no, I can't make out anybody.  They're too little.

Q  Does the individual--do you see the individual in the police vest?

A  Yeah.

Q  Does--the picture reveals the back of that particular individual in a police vest.  But does that look simi--does that look like the individual that you observed in the video of August 23rd, 2003?

A  I--I can't tell from this picture.

Q  By looking at this picture, do the--does it look

Q     like there are Raleigh police officers in this picture?

A     Yes.

Q     And how do you--what do you base that on?

A     Well, certainly not their faces because I can't see them, but I see a--a vest which looks like it could be a police vest and maybe a hat and a--a shirt the color of our Raleigh Police blue.  I couldn't even guarantee that was a police officer, but it probably is.

Q     Are you talking--did you--by "police blue," are you talking about on his uniform or on the car?

A     His uniform shirt.

Q     Okay.  All right.  Does the police car in the picture--is the picture--is the police car in the picture a Raleigh Police Department car?

A     Yes.

Q     How many of the cars in the photo are Raleigh Police Department cars if you can tell?

A     Well, there's one--there's a marked car, and I don't know what the other cars are.  They could be civilian car, and they could be an unmarked car.

Q     Are you aware of any unmarked cars responding to that event on August 23rd, 2003?

A    I don't have independent knowledge.

Q    Have you seen an unmarked car at the Raleigh Police Department before?

A    Yes.

Q    What color are they?

A    All different colors.

Q    Okay.  Do you have--does the Raleigh Police Department have any unmarked cars that are similar to the ones--to the unmarked car--to what could be unmarked cars in the photo?

A    Well, we--which car--there's a--there's a number of cars in the photo.

Q    Would you look first at the one--the largest of the car right--the largest car right in the front of the picture?

A    We have cars similar to that.

Q    Do you have--does the Raleigh Police Department have any unmarked cars that are similar to the one to the right of the marked car?

A    I can't really see that car, because it's obstructed by people.  If it's the same kind of car, then, yes, it's--if it's also a Crown Vic, yes.  But I--I'm not that good that I can tell a car just from its headlight.

Q    Okay.  Okay.  Thank you.  What is--would you please describe the events on August 23rd, 2003, from start to finish?

MS. LEAPLEY:  Objection.  That's been asked and answered.  The chief has told you that she doesn't have any independent knowledge about this event.

MS. MURRAY:  What I--what I'd like her to do is to describe the events as she understands them.

MS. LEAPLEY:  Based on what I've told her?

MS. MURRAY:  No, not based on what you've told her.

A    I don't have any independent knowledge of the events.

Q    (By Ms. Murray)  You don't have any independent knowledge of--other than what your counsel has told you?

A    As I said, I don't know how I became aware of what--of the events of that day, but I know they are not from being there that day and--and knowing firsthand what happened.  I don't know when I became aware of them or how I became aware of them,

Case 5:05-cv-00102-BO    Document 36    Filed 08/14/06    Page 58 of 65

but I have no independent knowledge as to what

happened.

Q       What I would like you to do is to describe what you

understand them to be other than what your counsel

has told you.

MS. LEAPLEY:  I think that's been asked

and answered.  Give it one more try.

MS. MURRAY:  I haven't--

MS. LEAPLEY:  If you know anything--

MS. MURRAY:  It has not been answered.

A       Again--

MS. MURRAY:  All I have heard from her is

that Gary Hinnant was there.

A       I don't have independent knowledge of this event on

that day, and I--and I cannot say where my

knowledge of this event comes from.  It's probably

a combination of things, including the lawsuit that

was served, and talking to counsel, and any other

conversations.  So I--I can't give a clear--you a

clear picture, because it's--it's obstructed by the

information that--that's come to me.  I don't know

where different parts of--of the story have come

from.

MS. MURRAY:  But I believe it is--it is a

proper question to have her describe events that occurred on a particular day as she understands them, if there's not a privilege issue.

MS. LEAPLEY: Let's go off the record for a second.

(DISCUSSION OFF RECORD)

Q  (By Ms. Murray) Outside of your conversations with your counsel, what knowledge do you have of the events on August 23rd, 2003, at the RB--concerning the events that Gary Hinnant responded to?

A  I don't recall having any knowledge other than that.

Q  Do you recall having any conversations with individuals other than your counsel concerning the events on August 23rd, 2003?

A  I don't recall but I certainly could have. I have many conversations about many things every day.

Q  Did you have a conversation with Gary Hinnant concerning the events on August 23rd, 2003?

A  I don't remember if I did or didn't. I don't remember.

Q  Did you have any conversations with any other officer who was at--who responded to the events at issue in the complaints?

A       I don't remember.  I could have.  I don't remember having any, though.

MS. MURRAY:  Just a moment, please.

Q       Earlier you mentioned that it was easy for picketers to obtain a permit once officers come upon picketers.

MS. LEAPLEY:  A receipt.

MS. MURRAY:  Excuse me?

MS. LEAPLEY:  I think receipt--

A       A receipt I was talking about.

Q       (By Ms. Murray)  Okay.

A       Again, we don't have permits.

Q       Okay.  I believe you said that it was easy for picketers to obtain a receipt--receipt of notice of notice to picket.  And we talked about how sometimes an--can you elaborate more on why that is easy to obtain a permit?

A       Well, we purposely make it easy, because we want everybody to be able to express whatever it is that you want to express.  So we have our main headquarters, which is right in the middle of downtown.  It's not--it's not in an obscure location.  We let people phone, fax or come in.  We make every effort to be able to have them give us

notice and have us give them back a receipt.

Q  Do you have any knowledge of any officers actually delivering a--a form for--delivering a notice--picketing notice to an--to an individual who wanted to engage in picketing activities rather than having them go to the station and pick it up or have it faxed to them?

A  I don't know.  I'm sure it can happen, because you can--as I said, you can phone, you can fax. So--and again, anything--you know, if we--if we have the time--time, if we're not involved in something else, we have the ability to help them. We--we try and help them in any way.

But, I mean, they--it's easy to get to downtown from any place in the city and go pick up a permit yourself.

Q  Can an officer actually deliver the--the notice to the individual?

A  The--the individual is the one who delivers the notice.  We give them a receipt.

Q  Earlier we talked about how an individual can call in with the information to be--to be--call in with the information.  Is it--are there times where a--where a Raleigh police official can fill it out

Pace Reporting Service, Inc.
Wilmington (910) 790-5599 ◆ Raleigh (919) 859-0000 ◆ Fayetteville (910) 433-2926

Q Okay. And at that point where the official sign--could the official sign the notice?

A A supervisor could sign the notice, yes.

Q So it is possible to have an individual and then--strike that.

Is it possible then for the official to fax that back to the individual without the individual having to even step foot in the office of the Raleigh Police Department?

A I would think it could--I would think it could be done depending again on the--the--how busy it is and where the person is. If they're next to a fax machine, we would probably try to accommodate them.

Q Has a police officer for Raleigh ever hand-delivered a notice that had been approved to a picketer?

A I don't know the answer to that.

Q Do you know if any police officers have any picketing notices in their vehicles?

A They probably do if they work in certain areas of the city.

Case 5:05-cv-00102-BO    Document 36    Filed 08/14/06    Page 63 of 65

Q    Do you know if Gary Hinnant had any notices for picketing in his vehicle on August 23rd, 2003?

A    I don't know but I wouldn't expect he would doing the--performing the duties that he was performing. Officers that might have that would be officers that will work downtown, for instance, where we often have demonstrations.

Q    Do you know if Dennis Green was provided with a picket notice on--on August 23rd, 2003?

A    I don't know.

Q    Do you know if Dennis Green or any individual--do you know if Dennis Green was informed about the picketing ordinance?

A    As I stated before, I have no independent knowledge of this entire incident.

              MS. MURRAY:  That's all the questions I have.

              MS. LEAPLEY:  I have no questions.  Thank you very much.

              (WITNESS EXCUSED)

_____

(WHEREUPON, THE DEPOSITION WAS CONCLUDED AT 1:05 P.M.)

_____

kap: (2/27/06)

STATE OF NORTH CAROLINA                                    -65-

COUNTY OF LEE

## C E R T I F I C A T E

I, Kimberly A. Petrarca, a Notary Public in and for the State of North Carolina, duly commissioned and authorized to administer oaths and to take and certify depositions, do hereby certify that on February 27, 2006, JANE PERLOV, being by me duly sworn to tell the truth, thereupon testified as above set forth as found in the preceding 64 pages, her examination being reported by me verbatim and then reduced to typewritten form under my direct supervision; that the foregoing is a true and correct transcript of said proceedings to the best of my ability and understanding; that I am not related to any of the parties to this action; that I am not interested in the outcome of this case; that I am not of counsel nor in the employ of any of the parties to this action.

IN WITNESS WHEREOF, I have hereto set my hand and affixed my official notarial seal, this the 13th day of February, 2006.

<u>Kimberly A Petrarca</u>
Notary Public

My Commission Expires 6/24/2006

Kimberly A. Petrarca
PACE REPORTING SERVICE
P. O. Box 252
Cary, North Carolina  27512
Telephone:  919/859-0000 - Raleigh
            910/433-2926 - Fayetteville
            910/790-5599 - Wilmington



Pace Reporting Service, Inc.
Wilmington (910) 790-5599 ◆ Raleigh (919) 859-0000 ◆ Fayetteville (910) 433-2926